**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br>vs.<br><br>JAKARR DUDLEY,<br><br>        Defendant. | Case No. 2:20-cr-00037-GMN-NJK<br><br>REPORT AND RECOMMENDATION<br><br>(Docket No. 23) |

This matter was referred to the undersigned Magistrate Judge on Defendant Jakarr Dudley's motion to suppress evidence. Docket No. 23. The Court has considered Defendant's motion and exhibits, the United States' response and exhibits, Defendant's reply, the evidence and arguments presented at an evidentiary hearing held before the Court, and the parties' supplemental briefs. Docket Nos. 23, 24, 28, 29, 36, 37, 39, 53, 58, 60.

**I.  BACKGROUND**

    **A.  Testimony of Detective Marin**

On May 17, 2019, Las Vegas Metropolitan Police Department ("LVMPD") Detective Jason Marin was assigned to the gang investigation section, conducting proactive enforcement in the Bolden Area Command in Las Vegas, Nevada. Docket No. 56 at 9-10, 16, 18, 58. Based on his training and experience, Detective Marin knows that the Villa Capri Apartments at 1701 J Street are known as a high crime area, occupied in part by members of the Hustlers Taking Over ("HTO") gang. *Id*. at 17-18, 59-60. Detective Marin further knows that violent crimes, including homicides, attempted homicides, narcotics sales, and firearm crimes were known to occur at this

location. *Id*. at 18. On that date, Detective Marin was in uniform wearing a body camera and was the passenger in a marked police vehicle along with his partner, LVMPD Officer Bowler. *Id*. at 18-19, 58. At approximately, 6:30 p.m., the officers were in the area of the Villa Capri Apartments. *Id*. at 19.

On that day, Detective Marin knew of no calls regarding trespassing at the Villa Capri Apartments. *Id*. at 60. He also knew of no calls of anyone being asked to leave and failing to do so, no calls of drug sales, gang activity, homicides, attempted murder, or any other crimes at that location. *Id*. at 60, 80. Detective Marin described the "no trespassing" signs posted on the buildings to the left and right of the front entrance to the apartments, as well as in other places around the complex. *Id*. at 21-23. The signs say "No trespassing," that violators "will be prosecuted," and cite to NRS 207.200. Exhibit 2 from evidentiary hearing.

Prior to driving through the front entrance of the complex, Detective Marin observed six males "hanging around a vehicle" in the Villa Capri Apartments parking lot. Docket No. 56 at 26-27, 61. At that point, he could not tell who the males were, but decided to drive into the complex to see what was happening. *Id*. at 61. Detective Marin's vehicle drove in through the main gate, which was open and did not require a code. *Id*. at 62. When he got closer to the group, Detective Marin recognized Defendant, Anthony Mabry, Jr., Anthony Martice Mabry, and Adreon Caver in this group of males and later learned that one of the other males was Deangelo Taylor and the other was believed to be Brent Brimite. *Id*. at 28, 30. The males were not fighting, engaging in gang activity or drug sales, displaying firearms, or wearing gang colors. *Id*. at 71-73. The group was in the parking lot, which is a common area that anybody can access, gathered around a Volkswagen vehicle with an open hood. *Id*. at 64, 70. Defendant appeared to be working on the vehicle and was holding "some type of car fluid in his hand." *Id*. at 70. Detective Marin knew Defendant

because he had "dealt" with him previously and was aware that Defendant had a prior felony conviction. *Id*. at 28-29. To Detective Marin's knowledge, none of these individuals lived at the Villa Capri Apartments, though he did not recognize all of the men, he did not know anyone's exact address, and he based his knowledge on stops from within a year prior to this stop. *Id*. at 30, 73-74, 80, 85. As an example, Detective Marin knew that Defendant did not live at that location based on a prior contact on July 4, 2018,[1] and another prior contact whose date the detective cannot remember. *Id*. at 81-84. As a result, he wanted to stop the males to "verify whether or not they resided there and what business they were conducting there." *Id*. at 39.[2]

When he stopped the group of males, Detective Marin did not know that Taylor lived in one of the apartment complexes in that area and had his car parked in the common parking lot. *Id*. at 86. Detective Marin also did not know whether Defendant had moved to that area since his last stop or had legitimate business at the complex. *Id*. Further, it was possible that Defendant was a guest of someone who lived in the complex or that he was granted access by one of the people in his group. *Id*. at 86-87. Detective Marin did not know that Defendant's sister lived in the complex at that time. *Id*. at 87. On the day of the stop, Detective Marin never asked Defendant why he was at the complex. *Id*. at 88.

It was within Detective Marin's discretion to have a consensual encounter with the men in the group, where he just asked if any of them lived at that location. *Id*. at 76. Instead, he decided

---

[1] During that encounter, Defendant claimed that he was no longer a gang member, though Detective Marin believes that gang members often deny their membership. *Id*. at 89-90, 164-165. Since, on this date, Defendant was affiliating with members of the HTO gang in an area known for the gang members to congregate, Detective Marin believes Defendant belongs to HTO. *Id*. at 166.

[2] Detective Marin can not recall whether he conducted any trespassing investigations at this apartment complex prior to this date. *Id*. at 163-164.

1  to conduct a stop where he had the men come to his patrol car to investigate a trespass crime. *Id*.
2  at 76-77. Detective Marin was investigating Defendant for trespassing even though he did not
3  appear to be annoying anyone on the property and he was not loud, drinking alcohol, smoking, or
4  causing a disturbance. *Id*. at 78-79. Neither Detective Marin nor Officer Bowler called into
5  dispatch to state that they were conducting a stop or to ask for backup, despite the fact that there
6  were two officers and six males in the group they were stopping, they were in a high crime area,
7  and Detective Marin recognized that some of the men were gang members. *Id*. at 77-78.
8  Additionally, in violation of LVMPD policy, Detective Marin did not initiate his body camera
9  when he exited his vehicle. *Id*. at 78.
10      Detective Marin and Officer Bowler asked the males to walk to the front of the officers'
11  vehicle so that the officers could "investigate the trespassing, identify [the males] properly." *Id*.
12  at 30. The two officers got out of their vehicle and asked the six males "to come to the front of
13  our vehicle so that we could speak with them." *Id*. Detective Marin did not tell the males why he
14  issued this command. *Id*. at 96. At that point, Defendant was at the front of the vehicle, a
15  Volkswagen that he was working on. *Id*. at 30, 35. Defendant then went inside the driver's side
16  of the vehicle, where he was concealed from the officers' view by the front hood of the car, which
17  was open. *Id*. at 30. Detective Marin never saw Defendant reach under the vehicle. *Id*. at 99.
18  Two males were sitting on the retaining wall near the rear of the vehicle. *Id*. at 30. Defendant was
19  at the front of the vehicle when Detective Marin and Officer Bowler approached. *Id*. Detective
20  Marin asked Defendant to come to the front of the vehicle, using Defendant's gang name, Fat Karr.
21  *Id*. at 31, 99. Defendant corrected Detective Marin regarding his name but did not come to the
22  front of the vehicle. *Id*. at 31, 96. As Detective Marin walked over to physically escort Defendant
23  to the front of the patrol vehicle, two of the males ran southbound through the apartment complex,

chased by Officer Bowler. *Id*. at 32, 102-103.  The man believed to be Brent Brimite ran northbound. *Id*. at 32, 103.

Although the other men were walking around the vehicle, and some fled the scene, Detective Marin focused on Defendant. *Id*. at 102. Detective Marin did not tell Defendant why he commanded him to go to the front of the patrol vehicle, and Defendant did not initially comply with this command. *Id*. at 103. Defendant later stated that he did not do so because he was fixing a car and was not doing anything wrong. *Id*. at 103, 108.

Detective Marin escorted Defendant to the front of the patrol vehicle and placed him in handcuffs. *Id*. at 37, 104. Defendant did not try to flee at any time. *Id*. at 104. It was at this time that Detective Marin activated his body cam. *Id*. Even as he took Defendant into custody, Detective Marin did not tell Defendant why he was doing so or ask him why he was present at that location. *Id*. Dtective Marin removed the bottle of car fluid from Defendant's hand and put it on the hood of the vehicle. *Id*. Prior to placing Defendant in handcuffs, Detective Marin patted him down for weapons, but did not find any. *Id*. at 105. At this point, Defendant was not free to leave. *Id*. The two other men who remained on the scene – Deangelo Taylor and Anthony Mabry, Jr. - walked on their own to the front of Detective Marin's vehicle. *Id*. at 32, 41-42. Detective Marin patted each of these men down for weapons but did not handcuff either one. *Id*. at 105. Detective Marin placed Defendant in handcuffs because Defendant did not comply when the detective ordered him to go to the front of the patrol vehicle. *Id*. at 38. Detective Marin "didn't know at that time if he was … when he was walking away, if he was going to start running. We had already had three people run from us, so I placed him in handcuffs for officer safety reasons to make certain he didn't flee or fight." *Id*.

Once Detective Marin had all three men at the front of his vehicle and had performed his pat-downs, he "maintained a visual on all three males" while asking for backup since his partner had run after two of the other men. *Id*. at 38, 105-106. Detective Marin also monitored the radio in case his partner needed anything while he waited for backup to arrive. *Id*. at 38. During this time, Detective Marin did not ask any of the three males any questions about the trespass he was investigating, as he was waiting for backup to arrive and listening to the police radio. *Id*. at 38-39, 107. Detective Marin did not ask the men if they lived at the location or if they knew someone that lived there, though he asked them some questions about the vehicle. *Id*. at 107. In response to the detective's questions, Defendant said the vehicle belonged to his girlfriend's mother, he was working on it, and no one else was inside it. *Id*. at 107-108.

Detective Marin refused to tell the men why he was detaining them, even though Defendant asked him more than once why he was being detained. *Id*. at 106. In response, Detective Marin used a curse word in telling the men to be quiet because he was listening to the police radio and had just had three people flee. *Id*. Defendant asked Detective Marin why he was in handcuffs and Detective Marin responded that he could put anyone he wanted in handcuffs. *Id*. at 108. The three men complied and waited for backup to arrive. *Id*. at 106-107. Prior to this date, Detective Marin had not had any prior contacts with Deangelo Taylor and did not know who he was. *Id*. at 42.

A backup officer arrived at Detective Marin's location about four to five minutes after he had requested one. *Id*. at 39, 107. Once backup arrived, Detective Marin instructed that officer to watch the males at the front of his vehicle while he walked to the front of the Volkswagen that Defendant had been working on. *Id*. at 39, 108. Since Defendant and the unknown male had been at the front of the vehicle when the detective first saw them and they did not comply with the

6

1  detective's instructions, Detective Marin "went to go check the immediate area of where they were
2  last seen at, see if there [were] any weapons in that general area." *Id*. at 39-40.  Detective Marin
3  did not know why the other males fled and thought it was possible that a crime was afoot and knew
4  that gang members "typically" carry firearms. *Id*. at 40.  As a result, for officer safety purposes,
5  he wanted to see if any weapons or firearms were in the "general area." *Id*.  Detective Marin
6  looked around under the open hood of the vehicle and lifted the battery cover. *Id*. at 108-109.
7  Detective Marin found a Glock 17 firearm on the ground just under the engine area of the
8  Volkswagen. *Id*. at 40, 109.  After he recovered the firearm, Detective Marin and the backup
9  officer placed Mabry and Taylor in handcuffs. *Id*. at 43, 109-110.

10        Detective Marin advised Defendant of his *Miranda* rights and told him he had found a
11  firearm under the Volkswagen. *Id*. at 43, 113.  Defendant denied possessing or owning the firearm,
12  but admitted he was a convicted felon. *Id*. at 43-44, 111, 113.  As Detective Marin continued his
13  investigation, he released Defendant, Taylor, and Mabry from custody. *Id*. at 45.  After releasing
14  Defendant, Detective Marin would have let him remain in the apartment complex. *Id*. at 122.
15  Detective Marin said that, at that point, he had learned that Defendant was visiting a resident of
16  the apartment complex, Deangelo Taylor. *Id*.  The backup officer created a contact card for the
17  stops in the instant case. *Id*. at 118.  The top of the contact card contains several types of contacts
18  that can be checked as applying to the stop at issue, including a box for trespassing. *Id*. at 119.  In
19  this case, the contact card specifically does not have the trespassing box checked and, instead, the
20  box marked "other" is checked. *Id*. at 119-120.

21        Detective Marin then applied for a search warrant for the vehicle and a buccal swab from
22  Defendant. *Id*. at 45-46, 121.  In his affidavit, Detective Marin mistakenly stated that Defendant
23  has a criminal history for narcotic sales, which was not true. *Id*. at 50-51.  Also, while talking to

7

the judge, Detective Marin said he "screwed up" and released Defendant before asking for his consent. *Id*. at 121-122. The warrant was issued by a Clark County, Nevada Justice Court judge. *Id*. at 46, 116. During the search of the vehicle, two additional firearms – a Glock 22 and a Glock 42 - were recovered in the trunk of the vehicle and a red sweatshirt, water bottle, and Auto Zone receipt in Defendant's name were recovered inside the vehicle. *Id*. at 53-54. Defendant's DNA profile was a match to the magazines of all three firearms. *Id*. at 56. Detective Marin applied for and obtained an arrest warrant for Defendant in October 2019. *Id*. at 68, 144. Before Detective Marin could execute that warrant, however, Defendant was arrested during a routine traffic stop. *Id*. at 144.[3]

### B. Other Testimony

Defendant testified at the evidentiary hearing. *See* Docket No. 57 at 5-30. Additionally, Detective Marin testified as a rebuttal witness to Defendant's testimony. *Id*. at 31-44. The Court finds that this testimony is not relevant to its decision on this motion; therefore, the Court has not included this testimony herein.

## II. ANALYSIS

### A. Credibility of Witnesses

The Court ordered an evidentiary hearing in order to make an accurate determination of what occurred in the instant case and how the facts relate to the applicable caselaw. "The longstanding and repeated invocations in caselaw of the need of district courts to hear live testimony so as to further the accuracy and integrity of the factfinding process are not mere

---

[3] The Court does not find the prior incident discussed in the testimony relevant to its decision on the instant motion; therefore, the Court has not included it in this Report and Recommendation. *See* Docket No. 56 at 144-155, 158-161.

8

platitudes. Rather, live testimony is the bedrock of the search for truth in our judicial system." *United States v. Thoms*, 684 F.3d 893, 903 (9th Cir. 2012). "[J]udges simply cannot decide whether a witness is telling the truth on the basis of a paper record and must observe the witnesses' demeanor to best ascertain their veracity - or lack thereof." *Oshodi v. Holder*, 729 F.3d 883, 892 (9th Cir. 2013) (internal citation omitted). *See also United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) (evidentiary hearing required where defendant demonstrates that a significant disputed factual issue exists); *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) ("There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility").

During the evidentiary hearing in this matter, the Court had the opportunity to listen to the testimony of all witnesses, to observe and evaluate each witness' demeanor while testifying, and to weigh each witness' credibility. Having done so, the Court finds that it need only determine the credibility of Detective Marin in making its determination herein and the Court finds that Detective Marin testified credibly.

### B.     Motion to Suppress

Defendant submits that the officers lacked reasonable suspicion to stop him for trespassing. Docket No. 23 at 12-14; Docket No. 70 at 18-23. Defendant further submits that, even if the Court finds reasonable suspicion existed, Detective Marin unlawfully prolonged the stop before he recovered the firearm. Docket No. 23 at 14-17; Docket No. 70 at 24-25. Therefore, Defendant asks the Court to suppress all evidence seized as a result of the stop as fruit of the poisonous tree. Docket No. 23 at 17. Further, Defendant submits that the affidavit for the warrant to search the vehicle fails to establish probable cause and is invalid under *Franks*. Docket No. 23 at 17-26; Docket No. 70 at 25-30.

In response, the United States submits that the officers had reasonable suspicion to believe that Defendant was violating Nevada's trespassing law when they attempted to make an investigatory stop and were allowed to briefly detain him in order to investigate the circumstances. Docket No. 28 at 6-9; Docket No. 58 at 13-16. The United States submits that trespass is a valid basis for detention. Docket No. 28 at 9-10. The United States further submits that the officers did not unlawfully prolong the stop and that it was longer than it would normally have been because Defendant's conduct and the flight of the other individuals from the group provided the officers with reasonable suspicion of additional criminal activity. *Id*. at 10-12; Docket No. 58 at 16-17. Next, the United States submits that the firearm found under the vehicle was legally abandoned and that Defendant lacks standing to challenge its recovery. Docket No. 28 at 12-13; Docket No. 58 at 7-8. In support of this argument, the United States submits that the firearm was found on the ground under a vehicle in a shared parking lot, it was abandoned prior to Defendant's detention, and Defendant denied possessing or owning the firearm. Docket No. 28 at 13-14; Docket No. 58 at 8-9. Finally, the United States submits that probable cause existed for the issuance of the search warrant and it did not violate *Franks*. Docket No. 28 at 14-20; Docket No. 58 at 10-13. Therefore, the United States asks the Court to deny Defendant's motion. Docket No. 28 at 21.

In reply, Defendant submits that the trespassing signs on the apartment buildings were not in the parking lot or at vehicle entry points, which suggested that the applied to the buildings and not the parking lot. Docket No. 37 at 3. Further, Defendant submits that the lack of signs in the parking lot combined with the openings through which vehicles may freely pass indicates a lack of intent to restrict ingress. *Id*. at 4. Defendant also submits that Nevada's trespass statute must be construed to allow for the possibility of guests. *Id*. at 7-8. Further, Defendant submits that officers did not have reasonable suspicion to believe that he was in violation of the trespass statute.

*Id*. at 9-11.[4] Defendant further submits that his behavior and the flight of other men did not allow officers to prolong the investigation. Docket No. 37 at 14-15; Docket No. 70 at 8. Defendant submits that he has standing to challenge the seizure of the firearm under the vehicle. Docket No. 37 at 17-18; Docket No. 70 at 8-9. Further, Defendant submits that probable cause did not exist to support the issuance of the search warrant, and that it violated *Franks*. Docket No. 37 at 19-21; Docket No. 70 at

### 1. Investigative Stop

"The Fourth Amendment permits brief investigative stops ... when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 134 S.Ct. 1683, 1687 (2014) (internal quotation marks omitted). An investigatory detention, a brief seizure by police based on reasonable suspicion of criminal activity, is a "narrowly drawn exception to the probable cause requirement of the Fourth Amendment." *Terry v. Ohio*, 392 U.S. 1, 26 (1968). *See also United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (*en banc*) (Fourth Amendment permits investigatory stops when law enforcement officers have "reasonable suspicion" that criminal activity "may be afoot") (internal quotation marks omitted). "[R]easonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form

---

[4]  In supplemental briefing, Defendant further submits that the United States failed to establish the high crime factor for the apartment complex. Docket No. 70 at 18-19. Defendant also submits that Detective Marin's testimony "confirmed" that the apartment complex's "main entry gate is typically open an was open on the date of the stop, the back gate is sometimes open, … and anybody can access the parking lot," none of the no trespass signs were posted in the parking lot itself, the officers did not receive a trespass call, and the officers "did not hear or see anybody tell the men to leave." *Id*. at 19-20.

a basis for particularized suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (*en banc*).

The police may stop an individual reasonably suspected of criminal activity, question him briefly, and perform a limited pat-down frisk for weapons. *Terry*, 392 U.S. at 22-24. "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id*. at 21 (citations and internal quotation marks omitted). "In assessing whether a detention is too long in duration to be justified as an investigative stop," it is proper "to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Ultimately, the analysis remains one of reasonableness, and thus the Court must examine the "totality of the circumstances" surrounding the stop to determine whether the length is reasonable. *See United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir. 2008). Reasonable suspicion "is dependent upon both the content of information possessed by police and its degree of reliability." *United States v. Edwards*, 761 F.3d 977, 983 (9th Cir. 2014) (internal citation omitted).

Determining reasonable suspicion requires considering the totality of the circumstances, and "all relevant factors must be considered in the reasonable suspicion calculus-even those factors that, in a different context, might be entirely innocuous." *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1117 (9th Cir. 2003) (quoting *United States v. Arvizu*, 534 U.S. 266, 277-78 (2002)). Reasonable suspicion may depend on an officer's personal experience and special training to make inferences and deductions, as long as the conclusions are reasonable. *United States v. Montero-Camargo*, 208 F.3d 1122, 1131 (9th Cir. 2000) (internal citation omitted). *See also Lopez-Soto*,

205 F.3d at 1105 (*quoting United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996)) (police officer "is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also 'be grounded in objective facts and be capable of rational explanation'").

When considering the totality of the circumstances, courts must keep in mind that reasonable suspicion is a "commonsense, nontechnical conception[ ] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983). Reasonable suspicion may not be based on "broad profiles," "overbroad generalizations," or "a prefabricated or recycled profile of suspicious behavior[.]" *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121, 1124, 1126 (9th Cir. 2002) (internal quotation marks omitted). However, a stop may be founded on reasonable suspicion despite a possible innocent explanation for every police observation. *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000). Moreover, given that the standard for reasonable suspicion is "a particularized and objective basis for suspecting the person stopped of criminal activity[,]" the "quantum of proof needed for reasonable suspicion is less than a preponderance of evidence, and less than probable cause." *Id*. (internal quotation marks omitted).

Temporarily handcuffing Defendant does not make the *Terry* frisk automatically invalid because a permissible *Terry* frisk takes place when an officer suspects the Defendant is dangerous. *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1983) ("A brief but complete restriction of liberty, if not excessive under the circumstances, is permissible during a *Terry* stop and does not necessarily convert the stop into an arrest"). Indeed, it stands to reason that the issue of whether Defendant was permissibly handcuffed prior to the pat-down collapses into whether the officer

13

reasonably believed the individual was armed and dangerous (and therefore justified in conducting a *Terry* frisk). *See, e.g.*, *United States v. Kinsey*, 952 F. Supp. 2d 970, 973 (E.D. Wash. 2013).

The court must, therefore, determine whether Defendant's investigatory detention was based on reasonable suspicion. Whether a person has been seized for purposes of the Fourth Amendment is a mixed question of law and fact. *United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994). The Ninth Circuit defines "reasonable suspicion" as "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *United States v. Rojas-Millan*, 234 F.3d 464, 468-69 (9th Cir. 2000) (quoting *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000)). If an officer does not have reasonable suspicion, and the stop therefore violates the Fourth Amendment, any evidence obtained as a result of the stop must be suppressed as fruit of the poisonous tree. *United States v. Thomas*, 211 F.3d 1186, 1192 (9th Cir. 2000) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).

In looking at the totality of the circumstances, the Court finds that specific, articulable facts, together with objective and reasonable inferences, did not exist to give rise to reasonable suspicion. Detective Marin stopped Defendant and the other men to investigate a trespass. NRS 207.200, Nevada's trespass statute, states in relevant part that:

> 1. Unless a greater penalty is provided pursuant to NRS 200.603, any person who, under circumstances not amounting to a burglary;
>
> (a) Goes upon the land or into any building of another with intent to vex or annoy the owner or occupant thereof, or to commit any unlawful act; or
>
> (b) Willfully goes or remains upon any land or in any building after having been warned by the owner or occupant thereof not to trespass,

is guilty of a misdemeanor.

The statute lists the methods by which an adequate warning against trespassing may be made, including fencing the area or "the owner or occupant of the land or building making an oral or written demand to any guest to vacate the land or building." NRS 207.200(2)(c) and (d). A "reasonable interpretation of the statute would dictate that posted warning signs are subject to an owner or occupant granting permission to an individual visiting her apartment." *United States v. Eppenger*, 2012 WL 4617677, at *6 (D.Nev. 2012). Therefore, a no trespassing sign does not prevent the property owner or tenant of an apartment building from granting access to the property to a guest. "To suggest otherwise would justify the arrest of any visitor to the apartment complex, regardless of the [property owner or tenant's] permission or legitimate business of the visitor. Such a construction is absurd and Nevada statutes are construed so as to avoid absurd results." *Id*.

Detective Marin observed Defendant and the other males standing and sitting around the vehicle. He knew that, as of July 2018, Defendant did not live at this complex and also believed that at least one of the other males did not live there. As a result, he decided to stop the males to investigate whether they violated the trespass statute or, in his words, to "verify whether or not they resided there and what business they were conducting there." Docket No. 56 at 39. When Detective Marin approached, some of the males ran, but Defendant remained at the vehicle. Defendant was holding a bottle of car fluid and appeared to be working on the vehicle. Detective Marin decided to place Defendant in handcuffs, simply because he did not immediately comply with the detective's commands to go to the front of the patrol vehicle.

While Detective Marin stood at the front of his vehicle with Defendant and two other men awaiting backup for four to five minutes, he never asked if Defendant or any of the men lived in that complex or if Defendant or any of the men was a visitor to that complex. He never determined,

or tried to determine, whether Defendant or any of the men had been warned not to trespass onto that land.  Further, he never determined, or tried to determine, whether Defendant or any of the men was on that land with the intent to vex or annoy the owner or occupant of the land or to commit any unlawful act.  Instead, Detective Marin asked Defendant questions about the vehicle, which Defendant answered.  These questions demonstrate that Detective Marin was not solely listening to the police radio and that he could have asked Defendant and the other men simple questions to determine whether they had violated the trespass statute.  Even after backup arrived, however, Detective Marin still did not ask questions related to the trespass investigation.  Rather, he left Defendant and the other two men with the backup officer and walked over to check the Volkswagen for weapons.  Detective Marin simply did not have specific, articulable facts which, together with objective and reasonable inferences, formed the basis for suspecting that Defendant was engaged in criminal trespass.  The Court therefore, under the totality of the circumstances, finds that no reasonable suspicion existed for the stop and, in any event, Detective Marin unreasonably prolonged the stop when he failed to investigate trespass for over five minutes.

### 2.  Remaining Issues

Since the Court has found that no reasonable suspicion existed for the stop in the instant case and, in any event, that the stop was unreasonably prolonged, any evidence seized as a result of the stop must be suppressed as fruit of the poisonous tree.  *See Thomas*, 211 F.3d at 1192.  As all evidence in this case was seized as a result of the initial stop, it all constitutes fruit of the poisonous tree.  Therefore, the Court need not reach the other issues raised by the parties.

. . . .

. . . .

. . . .

### III. RECOMMENDATION

Based on the foregoing and good cause appearing therefore,

IT IS RECOMMENDED that Defendant's motion to suppress evidence, Docket No. 23, be **GRANTED**.

DATED: April 8, 2021.

_____
NANCY J. KOPPE
UNITED STATES MAGISTRATE JUDGE

### NOTICE

This report and recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).  A party who objects to this report and recommendation must file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation.  Local Rule IB 3-2(a).  Failure to file a timely objection may waive the right to appeal the district court's order.  *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).