**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

JAKARR DUDLEY,

          Defendant.

Case No.: 2:20-cr-00037-GMN-NJK

**ORDER**

Pending before the Court is the Report and Recommendation ("R&R") of United States Magistrate Judge Nancy J. Koppe, (ECF No. 74), counseling that the Court grant Defendant Jakarr Dudley's ("Defendant's") Motion to Suppress, (ECF No. 23). The Government timely filed its Objection, (ECF No. 77) and Defendant timely filed a Response, (ECF No. 78).

For the reasons discussed below, the Court **ADOPTS** the R&R and **GRANTS** the Motion to Suppress.

I. **BACKGROUND**

On March 3, 2020, an Indictment was entered charging Defendant with one count of Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (*See* Indictment, ECF No. 1). The Indictment issued followed Defendant's arrest during an encounter between Defendant and the Las Vegas Metro Police Department. The specific facts underlying the encounter are outlined below.

On May 17, 2019, Officer Marin and Officer Bowler actively patrolled the area near Villa Capri Apartments.[1] (*See* Tr., vol. 1, 58:5–13); (*see also* R&R 2:12–13, ECF No. 74).

---

[1] Officer Marin testified that this is a high crime area based on his training and experience. (*See* Evidentiary Hr'g Tr., vol. 1 ("Tr., vol. 1") 18:7–9, ECF No. 56).

Villa Capri Apartments is a fenced-in apartment complex located at 1701 J Street, Las Vegas, NV. (Tr., vol. 1, 20:18–22). Part of their active patrol, Officers Marin and Bowler decided to drive into the apartment complex to see what was going on.[2] (*Id*. 61:16–18). On that day, Officers Marin and Bowler did not receive any calls regarding suspected criminal activity at Villa Capri Apartments—no calls regarding trespassing, drug sales, gang activity, homicides, or attempted murder. (*Id*. 60:2–19).

Once they drove further into the parking lot, Officers Marin and Bowler observed six men hanging around a silver 2003 Volkswagen in the Villa Capri Apartments parking lot. (R&R 2:12–13). The Volkswagen was parked in an open parking lot with the hood, driver's door, and trunk open. (Mot. Suppress 2:8–9, ECF No. 23). Two men, Anthony Mabry Jr. and Deangelo Taylor, sat on the edge of the open truck. (*Id*. 2: 9–10). Three other men sat on a retaining cement wall with their backs to the street. (*Id*. 2:10–13); (*see also* Tr., vol. 1, 30:16–17). Defendant stood at the front of the Volkswagen, apart from the rest of the group. (*Id*. 30:18). Defendant appeared to be working on the front of the vehicle and was holding "some type of car fluid in his hand." (R&R 2:22–23).

Officer Marin states that he and "Officer Bowler . . . conducted a stop on all six males for reasonable suspicion of trespassing on the property." (Arrest Report at 2, Ex. A to Mot. Suppress, ECF No. 23-1). Officer Marin testified that he recognized Defendant based on previous stops and other contact with him. (Tr., vol. 1, 28:4–21). To his knowledge, Officer Marin did not think any of the individuals resided at Villa Capri Apartments. (*Id*. 30:3-5). Based on this prior knowledge and the observed "no trespassing signs at the front of the complex," Officer Marin stopped the six men to "verify whether or not they resided there and

---

[2] Officer Marin further states that Villa Capri Apartments was a routine stop during his patrol in the Bolden Area Command, where Officer Marin was directed to patrol. (Tr., vol. 1, 20:5–7). During a routine shift, Officer Marin would visit Villa Capri Apartments at least once or twice. (*Id*. 20:8–12).

what business they were conducting there."³ (*Id*. 39:7–13). Though he could have performed a consensual encounter, Officer Marin testified that both he and Officer Bowler decided to conduct a stop—meaning, they planned to ask the six men to come to his patrol vehicle— because a stop was safer. (*Id*. 76:23–77:8).

To effectuate the stop, Officer Marin exited the police vehicle and ordered the men to walk towards him, away from the 2003 Volkswagen. (*Id*. 31:6–7). At that time, Defendant was at the front of the car and was holding a container of auto-repair liquid. (*See* Officer Bowler's Body Camera Video ("Video") 00:30–00:32, Ex. 2 to Govt.'s Resp to Mot. Suppress, ECF No. 28). Defendant then went inside the driver's side of the vehicle, locked the driver seat door, and walked away from Officer Marin and the remaining men. (*See id*. 00:34–00:38). Officer Marin never saw Defendant reach under the vehicle. (Tr., vol. 1, 99:2–3). Officer Marin then addressed Defendant using his gang moniker, specifically commanding "Fat Karr, come to the front of the vehicle." (*Id*. 31:17–18). Defendant answered, "My name's Jakarr." (*Id*. 30:22). As seen on Officer Bowler's body cam video, Defendant then walked away from Officer Marin. (Video 00:40–00:42). As Officer Marin walked over to Defendant to bring him to the police vehicle, three men who were sitting on the retaining wall ran away from the officers— two ran southbound and one northbound. (Tr., vol. 1, 32:2–6). Officer Bowler chased the two men who ran southbound while Officer Marin stayed with Defendant and the two other complying individuals. (*Id*. 32:14–15).

While Officer Bowler chased the two men, Officer Marin physically grabbed Defendant to move him to the front of the police vehicle. (*Id*. 37:7–10, 38:3–4). Office Marin also instructed the two remaining men to come up to the front of the vehicle and they complied. (*Id*.

---

³ Defendant asserts, in his Reply to the Motion to Suppress, that the "no trespassing" signs were likely posted after the stop given the sign's pristine condition. (Reply to Mot. Suppress 2:14–19, ECF No. 37). Further, Defendant argues that the signs could be interpreted as applying to the building itself rather than the parking lot because the signs were posted on the buildings and not at the entry points to the parking lot or the parking lot itself. (*Id*. 2:19–3:4).

37:10–12). At the front of the police vehicle, Officer Marin then placed Defendant in handcuffs.[4] (*Id*. 37:22–24). Officer Marin testified that he only placed Defendant in handcuffs because Defendant "wasn't complying when I ordered him to come up to the front of the vehicle. . . . We had already had three people run from us, so I placed him in handcuffs for officer safety reasons to make certain he didn't flee or fight." (*Id*. 38:2–8). At the front of the police car, Officer Marin conducted a protective pat-down of Defendant, Taylor, and Mabry Jr. (*Id*. 37:22–24). He did not find any weapons. (*Id*. 105:7–8). Additionally, Officer Marin did not continue asking about the possible trespass. (*Id*. 38:20–39:2). About five minutes into the stop, an assisting officer arrived upon Officer Marin's request for back up. (*Id*. 38:11–19). This assisting officer stayed with the three men while Officer Marin looked around the 2003 Volkswagen. (*Id*. 39:21–40:4). Officer Marin testified that he conducted the search based on "the trend that gang members typically will carry firearms." (*Id*. 40:7–11). He ultimately found a handgun underneath the car, below the engine. (*Id*. 40:16–17). Later, Officer Marin showed Defendant the location of the gun. (*Id*. 43:19–20). Defendant denied possessing or owning the gun Officer Marin located. (*Id*. 21–23).

In his Motion to Suppress, Defendant asks the court to exclude the firearm because the "police lacked reasonable suspicion to stop [Defendant] and, in any event, unlawfully prolonged the stop to investigate unspecified offenses." (Mot. Suppress 1:21–23). Following an evidentiary hearing, the Magistrate Judge recommends that this Court find that the officers lacked reasonable suspicion to stop Defendant, and in any event, unreasonably prolonged the stop. (R&R 16:12–14). The Magistrate Judge thus recommends that the Court suppress all evidence seized as the result of the stop as fruit of the poisonous tree. (*Id*. 16:16–20).

---

[4] It is around this time that Officer Marin turned on his body camera. (*See* Officer Marin's Body Camera Video, Ex. 3 to Govt.'s Resp. to Mot. Suppress, ECF No. 28).

## II. LEGAL STANDARD

A party may file specific written objections to the findings and recommendations of a United States Magistrate Judge made pursuant to Local Rule IB 1-4. 28 U.S.C. § 636(b)(1)(B); D. Nev. R. IB 3-2. Upon the filing of such objections, the Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections are made. *Id*. The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1); D. Nev. IB 3-2(b).

## III. DISCUSSION

The Government objects to the Magistrate Judge's Report and Recommendation on two grounds. First, the Government argues that Officer Marin had reasonable suspicion to stop Defendant for trespass. (Obj. to R&R ("Obj.") 7:9–18, ECF No. 74). The Government further claims that Defendant was not initially seized when Officer Marin commanded Defendant to come to the patrol car and instead, was seized for suspicious criminal activity when Officer Marin physically apprehended Defendant. (*Id*. 7:9–8:21). Second, the Government asserts that the traffic stop was not unreasonably prolonged because new grounds for suspected criminal activity and officer safety justified the extended stop. (*Id*. 6:13–15). The Government additionally requests the Court consider the issue of abandonment and probable cause to search the vehicle, though the Magistrate Judge's Report and Recommendation did not address the issue. (*Id*. 6:15–19). Specifically, the Government contends that Defendant abandoned the firearm prior to a seizure and thus, does not have standing under the Fourth Amendment to assert exclusion of the firearm. (*Id*. 14:15–21:6). The Court first discusses whether a seizure occurred and whether Officer Marin had reasonable suspicion to seize Defendant.

### A. Seizure

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend.

IV. A warrantless search or seizure is presumed unreasonable unless it falls into a "specifically established and well-delineated exception[]." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 356 (1967)). For example, in *Terry v. Ohio*, the Supreme Court determined that a suspect on the street could be briefly detained and investigated without a warrant when an officer has "a reasonable suspicion of criminal activity based on 'specific and articulable facts and rational inferences from those facts.'" 392 U.S. 1, 19, 21 (1968); *Florida v. Royer*, 460 U.S. 491, 512 (1983). If the officers also have a reasonable suspicion that the suspect is armed and dangerous, they can then frisk or pat down the suspect in the interests of officer safety. *See Terry*, 392 U.S. at 24. "In deciding whether evidence is the product of an unlawful seizure, we first determine whether the defendant was seized at the time the handgun was discarded." *United States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013).

Before turning to the analysis of whether the officers had reasonable suspicion to conduct a stop, the Court must first determine at what point Defendant was seized for Fourth Amendment purposes.

i. Investigatory Detention

The Government argues that the officers' initial questioning of Defendant and the rest of the group did not constitute a *Terry* stop because Defendant did not submit to police authority. (*Id.* 8:15–21).[5] Notably, Defendant does not rebut this argument in its Response.

"[A] person is "seized" only when by means of physical force or a show of authority, his freedom of movement is restrained. . . . As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that

---

[5] Though this issue was not raised in the initial briefings, "a district court has discretion, but is not required, to consider evidence presented for the first time in a party's objection to a magistrate judge's recommendation." *United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000). The Court, in its discretion, considers the Government's new argument in its Objection to the R&R.

person's liberty or privacy as would under the Constitution require some particularized and objective justification." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980). "In order to constitute a seizure in the absence of physical force, an officer's show of authority must be accompanied by the person's 'submission to the assertion of authority.'" *United States v. Chambers*, No. 2:11-cr-00456-KJD-CWH, 2012 U.S. Dist. LEXIS 187893, at *15 (D. Nev. Nov. 21, 2012) (citing *California v. Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991)). However, "'momentary hesitation without more does not constitute a seizure." *United States v. Hernandez*, 27 F.3d 1403, 1407 (9th Cir. 1994).

For example, the Ninth Circuit in *United States v. McClendon* determined that the defendant was not seized because the defendant did not submit to the police's authority. *McClendon*, 713 F.3d at 1214. There, two officers drew their guns, told Defendant he was under arrest, and ordered him to show his hands. *Id*. at 1213. Defendant, in response, walked away from the officer's commands. *Id*. Because the defendant did not comply with the officer's show of authority, the Ninth Circuit held that the defendant was not seized for Fourth Amendment purposes. *Id*. The defendant argued that the police officers acted illegally when they raised their guns and declared that the defendant was under arrest. *Id*. at 1217. Regardless of how unreasonable the officers' actions were, the Ninth Circuit still concluded that the defendant did not submit to authority and therefore was not seized until he was tackled. *Id*.

The Ninth Circuit in *United States v. Smith* also held that the defendant was not seized when he initially hesitated and engaged in a short verbal exchange with the officer. *Smith*, 633 F.3d 889, 893 (9th Cir. 2011). There, the officer called for the defendant to stop and come stand in front of the police car. *Id*. at 891. The defendant asked some clarifying questions, took a few steps towards the police vehicle, but eventually backed away. *Id*. at 893. Because the defendant did not submit to the officer's authority, the Ninth Circuit determined that the

defendant was not seized under the meaning of the Fourth Amendment during the defendant's initial interaction with the police. *Id*. "Smith's Fourth Amendment rights were not violated by the attempted stop, *even if the officer did not have reasonable suspicion*, because the attempted stop was not a seizure for Fourth Amendment purposes." *Id*. at 892 (emphasis added). Because the defendant was not seized, the Ninth Circuit accordingly determined that it "need not decide whether the officer had reasonable suspicion justifying a Terry stop before Smith fled." *Id*. at 892.

The facts of this case are analogous to those in *Smith* and *McClendon*. Similar to officers in both cases, Officer Marin instructed Defendant to come towards him and Defendant did not comply. Using Defendant's gang moniker, Officer Marin ordered, "Fat Karr, come to the front of the vehicle." (Tr., vol. 1, 31:17-22). Defendant responded, "My name's Jakarr," but did not otherwise comply with Officer Marin's command or instruction. (*Id*. 31:23–24). As seen in Officer Bowler's body cam video, Defendant, in fact, walked away from Officer Marin in response to his instruction. (Video 00:40-00:45). Like the defendant in *Smith*, Defendant did not comply or otherwise submit to Officer Marin's instruction. *See Smith*, 633 F.3d at 893; *see also Hodari D*., 499 U.S. at 626 ("[A] policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee . . . is no seizure."). Defendant, therefore, was not seized for Fourth Amendment purposes during this initial encounter with Officer Marin. *See Bostick*, 501 U.S. at 437 ("[R]efusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.").

The Report and Recommendation focuses on whether the officers had reasonable suspicion to effectuate a *Terry* stop.[6] (*See* R&R 14:14–16). As illustrated in *Smith* and

---

[6] If Defendant was seized during the initial encounter with Officer Marin prior to Defendant's later detention, then the Magistrate Judge correctly found that there was no reasonable suspicion. Under *Terry*, an investigative stop is only permissible where "the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989) (citing *Terry*, 392 U.S. at 30).

*McClendon*, the Ninth Circuit focuses on whether Defendant was seized during the initial encounter, not the circumstances that led up to the initial encounter. *See McClendon*, 713 F.3d at 1217 ("Regardless of how unreasonable the officers' actions were . . ., he did not submit to authority and therefore was not seized until he was tackled."); *United States v. Smith*, 633 F.3d at 892 ("Smith's Fourth Amendment rights were not violated by the attempted stop, even if the officer did not have reasonable suspicion, because the attempted stop was not a seizure for Fourth Amendment purposes."); *United States v. Garcia*, 516 F.2d 318 (9th Cir. 1975); *United States v. Lomax*, No. 2:17-CR-00262-JAD-PAL, 2018 U.S. Dist. LEXIS 102157, at *7 (D. Nev. June 19, 2018) (finding that the defendant "was not seized as he fled from the police; he was seized under the Fourth Amendment when he finally surrendered in the yard."). Thus, even though the officers did not have reasonable suspicion to perform a *Terry* stop, the Court concludes that Defendant was not seized when Officer Marin initially instructed Defendant to walk towards the police vehicle. Because "there is no seizure without actual submission," the Court thus finds that Defendant's initial encounter with the officers did not constitute a seizure within the meaning of the Fourth Amendment. *Brendlin v. California*, 551 U.S. 249, 254, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007).

---

The Government, in the present case, fails to demonstrate that the officers had particularized suspicion that Defendant was trespassing to justify stopping Defendant. The presence of "no trespassing signs" at Villa Capri Apartments does not provide reasonable suspicion that trespassing occurred. *See United States v. Chambers*, No. 2:11-cr-00456-KJD-CWH, 2012 U.S. Dist. LEXIS 187893, at *12 (D. Nev. Nov. 21, 2012) ("[T]he presence of 'no trespassing' signs at Rayson Manor cannot provide reasonable suspicion that the crime of trespassing has occurred."). Furthermore, there was no evidence any criminal activity had been reported in the area. (Tr., vol. 1, 60:2–19). The officers did not conduct the investigatory stop in response to a call regarding suspicious transactions occurring in the apartment parking lot. *Cf. United States v. Ward*, 18 F. App'x 502, 503 (9th Cir. 2001) (finding that the officers had reasonable suspicion that the men were at least trespassing on the property given the call from the apartment complex manager, the men who matched the manager's description, and the men's flight upon police presence). Without those other factors, Defendant's presence in a high crime area alone cannot furnish the officers with reasonable suspicion that Defendant was unlawfully trespassing in the Villa Capri Apartments complex. *United States v. Diaz-Juarez*, 299 F.3d 1138, 1142 (9th Cir. 2002) (citing *Brown v Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L. Ed. 2d 357 (1979)). Defendant, in fact, disputes that the Government sufficiently established that the Villa Capri Apartments is a high-crime area. (*See* Def.'s Supplemental Brief 20:10–22:2). Under the totality of the circumstances, the Court finds that the officers did not have a particularized and objective basis to conduct a *Terry* stop.

ii. <u>Detention</u>

Though Defendant was not seized initially, the Court finds that Defendant was seized later when Officer Marin physically grabbed Defendant. "'[T]he use of physical means to restrain a person's movement,' such as by grabbing them, 'is the most obvious form of seizure.'" *Barsamian v. City of Kingsburg*, 597 F. Supp. 2d 1054, 1066 (E.D. Cal. 2009) (citing *United States v. Sokolow*, 831 F.2d 1413, 1416 (9th Cir. 1987), rev'd on other grounds, 490 U.S. 1, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989)). Here, Officer Marin testified, at the evidentiary hearing, that he "physically put [his] hands on" Defendant to move him to the front of the police vehicle. (Tr., vol. 1, 104:3–4). Defendant was thus seized when Officer Marin physically grabbed him near the Volkswagen, prior to moving him to the police car.

The Government argues that this later seizure was reasonable because the intervening flight of the three men, in addition to the existing factors, provided Officer Marin with reasonable suspicion to investigate Defendant for possible criminal activity. (Obj. 8:22–12:5). Defendant asserts, in response, that the three men's intervening flight does not factor into the reasonable suspicion analysis because Officer Marin's seizure prompted the other men to run. (Resp. to Obj. 19:16–20, ECF No. 78).

Reviewing the underlying evidence, the Court finds that the Government fails to meet its burden in demonstrating that Officer Marin's seizure is reasonable. *See Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1326 (1983) ("It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure."). First, the intervening flight of the three men is not a factor in the reasonable suspicion analysis. It is unclear from Officer Marin's testimony and the body camera recording if Officer Marin seized Defendant before or after the intervening flight of the three men. Officer Marin testified, at the evidentiary hearing that he "walked up to physically grab [Defendant] and escort him to the

front of the vehicle. *Meanwhile*, two other males ran southbound through the apartment complex." (Tr., vol. 1, 32:1–6). His testimony suggests that the other men fled prior to Officer Marin physically grabbing Defendant. Officer Bowler's body camera recording does not clarify the timing of the events.[7] As seen from 00:40–00:45, Officer Marin walks up to Defendant and is near the Defendant at the same time the three men flee. (Video 00:40–00:45). The video, however, does not show when Officer Marin physically grabbed Defendant in relation to when the three men fled. Without further evidence, the Court cannot consider the flight of the three men in analyzing whether Officer Marin had reasonable suspicion to seize Defendant.

The remaining factors—the high crime area, Officer Marin's belief that none of the men lived at the apartment complex, and Officer Marin's recognition of Defendant and others as active gang members—do not otherwise provide Officer Marin with reasonable suspicion to seize Defendant for trespass. At most, Officer Marin knew that Defendant and at least one other person, Mabry Jr., did not live at Villa Capri Apartments. (Tr., vol. 1, 39:7–13). However, this knowledge does not rule out the possibility that Defendant was invited as a guest to Villa Capri Apartments. Officer Marin's knowledge of Defendant as a gang member also does not furnish Officer Marin with reasonable suspicion that Defendant was trespassing. The Government does not provide additional justification from the initial stop to justify seizing Defendant. As Judge Koppe writes in the Report and Recommendation, Officer Marin "simply did not have specific, articulable facts . . . [to form] the basis for suspecting that Defendant was engaged in   . . . trespass." (R&R 16:10–12). Accordingly, because the remaining factors do

---

[7] In violation of Las Vegas Metropolitan Police Department ("LVMPD") policy, Officer Marin did not turn on his body camera when he exited the vehicle. (*See* Tr., vol. 1, 78:6–13). Thus, Officer Bowler's body camera is the only available recording.

not provide reasonable suspicion and the intervening flight does not apply to the seizure, the Court finds that Officer Marin's seizure of Defendant is unlawful.[8]

**B. Abandonment**

Though not addressed in the Report and Recommendation, the Government requests that this Court address the abandonment issue. (Obj. 14:18–23). The Government argues that Defendant abandoned the gun prior to seizure and therefore, the gun is not considered fruit of the poisonous tree. (*Id*. 14:19–22). Defendant, in response, claims that the gun was not abandoned until after Defendant was seized—specifically, when Defendant denied ownership of the gun. (Resp. to Obj. 25:7–16). Because Defendant's seizure was unlawful (whether initially or prolonged), Defendant asserts that the resultant abandonment was involuntary. (*Id*. 25:15–16).

"A defendant who voluntarily abandons property has no standing to contest its search and seizure." *United States v. Stephens*, 206 F.3d 914, 917 (citing *United States v. Garcia*, 909 F.2d 389, 391 (9th Cir. 1990)). Abandonment is ultimately a question of intent and may be inferred from words, acts, and other objective facts. *United States v. Kendall*, 655 F.2d 199, 201 (9th Cir. 1981) (quoting *United States v. Jackson*, 544 F.2d 407, 409 (9th Cir. 1976)). "[T]wo important factors [in demonstrating abandonment] are denial of ownership and physical relinquishment of the property." *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986). "[A]n abandonment that results from a Fourth Amendment violation cannot be voluntary." *Stephens*, 206 F.3d at 917 (citations omitted). The Government has the burden of establishing abandonment. *United States v. Fernandez*, 772 F.2d 495, 499 (9th Cir. 1985).

In *Stephens*, the Ninth Circuit held that the defendant abandoned the gun when he denied ownership of the bag three times. *Id*. at 916. There, officers conducted a routine narcotics and

---

[8] As determined in the R&R, the Court need not discuss the other issues raised by the parties because the Court finds that the initial stop and later seizure was unlawful. (*See* R&R 16:15–20).

weapons investigation of a Greyhound bus. *Id*. The defendant placed his bag in the overhead compartment above his seat. *Id*. On the bus, the officer approached the defendant and asked the defendant if the bag in the overhead compartment belonged to him. *Id*. The defendant denied ownership three times. *Id*. The Ninth Circuit ultimately determined that the repeated denials objectively demonstrated an intent to abandon property. *Id*. at 917.

Similarly here, Defendant abandoned the gun when he denied ownership of the gun, not when he placed the gun under the Volkswagen before Officer Marin grabbed him. (*See* Resp. to Obj. 25:7–8) (stating that he placed the gun beneath the car and at his feet where he was working before Officer Marin grabbed him). Like the defendant in *Stephens* who put his bag in the overhead compartment, Defendant's placement of the gun under the car does not demonstrate an intent to abandon the property. *See United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986) ("The inquiry [of whether a person has abandoned property] should focus on whether, through words, acts or other objective indications, a person has relinquished a reasonable expectation of privacy in the property at the time of the search or seizure."). Physical relinquishment of an object is merely one factor in determining whether an individual intends to abandon his or her property. *United States v. Jackson*, 544 F.2d 407, 409 (9th Cir. 1976) ("Abandonment [in the Fourth Amendment context] is not meant in the strict property-right sense."). As Defendant asserts, he could have intended to hide the gun where it would be easily accessible to him. (*See* Resp. to Obj. 25:9–13). Notably, the Government does not dispute this possibility.[9] The Government, therefore, fails to meet its burden in establishing that Defendant objectively abandoned the gun prior to seizure. *See Fernandez*, 772 F.2d at 499. Accordingly,

---

[9] In the Government's Response to the Motion to Suppress, the Government seemingly agrees that the Glock 17 handgun was abandoned post-seizure. (*See* Resp. to Mot. Suppress 13:5–10). It further asserts that the gun was abandoned prior to Defendant's detention; however, fails to support this claim and focuses significantly on whether Defendant was seized at the time of abandonment. (*Id*. 13:11-21).

consistent with *Stephens*, the Court finds that Defendant abandoned the gun later in the encounter when he denied owning the firearm.

The Government unsuccessfully attempts to distinguish *Stephens* from the present case, arguing that Defendant was not seized when he abandoned the gun. (Obj. 17:19–18:3). The Government's argument, however, hinges on the incorrect premise that Defendant abandoned the gun when he physically placed the gun under the car. Because Defendant abandoned the gun post-seizure and the seizure was determined unlawful, the Court finds that Defendant's abandonment was involuntary, and Defendant thus has standing to contest the Government's search and seizure.

**IV. <u>CONCLUSION</u>**

**IT IS HEREBY ORDERED** that the Report and Recommendation, (ECF No. 74), is **ADOPTED.**

**IT IS FURTHER ORDERED** that the Motion to Suppress, (ECF No. 23), is **GRANTED**.

**DATED** this __23__ day of June, 2021.

_____
Gloria M. Navarro, District Judge
United States District Court